UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Case No. 11-40544-PJS

**RICKY CARPENTER,**                            Chapter 7

        Debtor.                                 HON. PHILLIP J. SHEFFERLY
_____/

### SUPPLEMENT TO MOTION IN LIMINE TO EXCLUDE IN-COURT TESTIMONY OF DOSHIA M. BANKS' BECAUSE OF HER REFUSAL TO PROVIDE DEPOSITION TESTIMONY AND DOCUMENTS

        Daniel M. McDermott, United States Trustee for Michigan and Ohio, for his Supplement

states as follows:

        1.      On May 31, 2011, the United States Trustee filed his Motion in Limine to Exclude

In-Court Testimony of Doshia M. Banks' Because of Her Refusal to Provide Deposition Testimony

and Documents , Docket # 42.

        2.      At that time the transcript was not yet prepared and the United States Trustee

indicated he would supplement the Motion when the transcript was available.  The transcript is now

available.  Attached is a copy of the deposition of Doshia M. Banks referenced in the Motion.

        3.      The portions of the transcript most directly relevant to the Motion in Limine are

contained within:

        a.      Page 13, Line 25 through Page 17, Line 23, and

        b.      Page 52, Line 11 through Page 56, Line 5.

                                Respectfully submitted,

                                **DANIEL M. McDERMOTT**
                                **UNITED STATES TRUSTEE**
                                Region 9

                        By      /s/ Paul J. Randel (P58419)
                                Paul.Randel@usdoj.gov
                                Trial Attorney
                                Office of the U.S. Trustee
                                211 West Fort St - Suite 700
                                Detroit, Michigan 48226
Dated: June 2, 2011             (313) 226-4541

BANKSDOS V1.txt

```
 1            UNITED STATES BANKRUPTCY COURT
              EASTERN DISTRICT OF MICHIGAN
 2                  SOUTHERN DIVISION

 3    In re:

 4    RICKY CARPENTER,            Case No. 11-40544-PJS
                                  Chapter 7
 5          Debtor.              Hon. Phillip J. Shefferly
      _____/

 6
                    The deposition of DOSHIA M. BANKS, taken
 7    before Hope M. Markowitz, CSR-3900, Notary Public
      in and for the County of Oakland, acting in the County
 8    of Wayne, Michigan, at 211 West Fort Street, Suite
      700, Detroit, Michigan, on Friday, May 27, 2011, at or
 9    about 10:15 a.m.

10    APPEARANCES:

11                    OFFICE OF THE UNITED STATES TRUSTEE
                      BY: PAUL J. RANDEL, ESQ.
12                    211 West Fort Street, Suite 700
                      Detroit, Michigan 48226
13
                          On behalf of the U.S. Trustee.
14
      ALSO PRESENT:
15
                      Karen Riggs
16

17

18

19

20

21

22

23

24

25
```

Q & A COURT REPORTING (248) 681-2499

BANKSDOS V1.txt

1                     I  N  D  E  X

2   Witness:                                    Page

3   DOSHIA M. BANKS

4
          Examination by Mr. Randel              4
5

6

7

8

9

10

11
                 E  X  H  I  B  I  T  S
12
    Number              Description              Page
13
    Deposition 1        Business Card            33
14
    Deposition 2        Web Site Page            39
15
    Deposition 3        Forms                    51
16

17

18

19

20

21

22

23

24

25


                Q & A COURT REPORTING (248) 681-2499


                                                    3


1                       Detroit, Michigan
                        Page 2

2                    May 27, 2011

3                    at or about 10:15 a.m.

4                    --- --- ---

5              D O S H I A   M   B A N K S ,

6     was called as a witness and having been first duly

7     sworn to tell the truth, the whole truth and nothing

8     but the truth was examined and testified as follows:

9              MR. RANDEL:   Good morning.   We're here for

10    the deposition of Doshia Banks in Case Number

11    11-40544-PJS.   This is In Re: Ricky Carpenter.

12              All right.   Ms. Banks, have you ever given a

13    deposition before?

14              THE WITNESS:   No.

15              MR. RANDEL:   Okay.   But you understand how a

16    deposition works?

17              THE WITNESS:   Uh-huh.

18              MR. RANDEL:   You have to answer out loud.

19              THE WITNESS:   Yes.

20              MR. RANDEL:   That was one of the things I

21    was going to say.   There's a couple things that we

22    have to do to make a deposition work.   One is you have

23    to let me finish the question before you answer.   Do

24    you understand?

25              THE WITNESS:   Yes.


              Q & A COURT REPORTING (248) 681-2499


                                                    4


1              MR. RANDEL:   And one is you have to answer

2     out loud.   Do you understand that?

3              THE WITNESS:   Yes.
                        Page 3

      4              MR. RANDEL:  If you need to take a break,

      5       let us know and we'll take a break.  But I hope we

      6       won't be here that long.  Okay?

      7              THE WITNESS:  Okay.

      8                       EXAMINATION

      9       BY MR. RANDEL:

     10   Q   How did you first meet Ricky Carpenter?

     11   A   I met Ricky Carpenter -- he called my office.

     12   Q   And do you have any idea why he called your office or

     13       how he knew to call your office?

     14   A   Yes.

     15   Q   What was that?

     16   A   He heard my show regarding home foreclosure

     17       prevention.

     18   Q   Do you know approximately when that was?

     19   A   No.

     20   Q   Do you know approximately when he called?

     21   A   No.

     22   Q   All right.  You are here as part of an order that we

     23       agreed to the entry of, correct?

     24   A   Correct.

     25   Q   And one of the things you were supposed to do was make

                Q & A COURT REPORTING (248) 681-2499

                                                           5

      1       a payment to the court reporter for missing last week,

      2       right?

      3   A   Correct.

      4   Q   And it was actually supposed to be by money order or

      5       certified check but you gave her a personal check
                          Page 4

6      today, right?

7  A    Business check, correct.

8  Q    And that check will clear as far as you know?

9  A    Today, yes.

10  Q    All right.  And did you bring any records with you?

11  A    No.  I -- well, let me take that back.  Yes.  I

12      brought his original petitions that he did for his

13      Chapter 7 bankruptcy.

14  Q    Did you bring any other record than what you've

15      described as his original petitions?

16  A    Other than the original petition, I brought in his

17      contract that he signed that Judge Shefferly already

18      reviewed and I also brought in another contract

19      whereas he had given me permission to have his credit

20      report pulled.

21  Q    Other than that, have you brought anything else?

22  A    No.

23  Q    Do you have any other documents?

24  A    Not much, no.

25  Q    When you say not much, what do you mean?

Q & A COURT REPORTING (248) 681-2499

6

1  A    I have other documents pertaining to his property, his

2      home, regarding what he hired us for.

3  Q    Do you have a copy of that contract you mentioned?

4  A    Yes.

5  Q    May I see that, please?

6  A    I may not have that.  I have the other one.

7  Q    Well, why don't you let me take a look at the other

Page 5

8          one while you're looking for the one that you are

9          still looking for.

10                   By any chance is what you're looking at

11          (sic), the third page of what you handed me?

12    A    Yes.

13    Q    All right.  You've handed me three pages.  The first

14          says client release form?

15    A    Correct.

16    Q    The second page is a copy of a money order; is that

17          correct?

18    A    Correct.

19    Q    And then the third page says the DMB Self-Help Legal

20          Information Network Basic Service Agreement and then

21          in parenthesis Disclaimer, correct?

22    A    Correct.

23    Q    Other than this, do you have any contracts with

24          Mr. Carpenter?

25    A    That's it.

                                                        7

1                   And that there is an old form.

2    Q    Do you have a new form?

3    A    Yeah.  We have new forms.  We've had new forms.  It's

4          just a lot of -- when we first started the business,

5          it had a whole lot of forms and people had did stuff

6          for me and I then found out from the State of Michigan

7          that I couldn't have certain things, certain words, in

8          the documents so a lot of stuff had been changed.  And

9          so in the process of several I should say employees,

10      receptionists, secretaries -- starting a new business

11      is not -- they don't stay put so in other words, all

12      my records and stuff weren't exchanged like it should

13      have been.

14   Q   When you say we, who's we?

15   A   Individuals that assisted me in starting the business.

16   Q   Are you the sole owner of the business?

17   A   Yes.

18   Q   What is the corporate name of the business?

19   A   DMB Self-Help Information Network, Inc.

20   Q   Did you form that business?

21   A   Yes.

22   Q   When did you form it?

23   A   2009 or eight.

24          It's on the United States Government Web

25      site under business entity and you can see the

Q & A COURT REPORTING (248) 681-2499

8

1      articles.  I meant to bring those.

2   Q   What do you mean by see the articles?

3   A   The articles of incorporation it will show you.

4   Q   And you say that on the U.S. Government?

5   A   Well, no, State of Michigan Web site.  Thank you.

6   Q   Now, you said that you've changed this form?

7   A   Uh-huh.

8   Q   Is that a yes?

9   A   Yes.  When I found out that the word legal -- I

10      couldn't -- because of the type of business that I

11      have even though -- if I have attorneys that work with

Page 7

12    us and assist us, because they're not agents I cannot

13    have the word legal in my documentation.

14  Q  And who told you that?

15  A  State of Michigan.

16  Q  How did they tell you that?

17  A  Over the telephone.

18  Q  So you spoke to somebody, who you believe worked for

19    the State of Michigan?

20  A  Yes, when I was doing my articles. As a matter of

21    fact we had to redo them several times because of

22    that.

23  Q  So the change you made to your form was you took the

24    word legal out?

25  A  Correct.

Q & A COURT REPORTING (248) 681-2499

9

1  Q  Did you change the services you provide?

2  A  No, because it's document preparation.

3  Q  When you had legal information network in your

4    documents, was it true?

5  A  Meaning?

6  Q  Were you providing legal information?

7  A  Oh, no.

8  Q  So why did you have it in the title?

9  A  Because that was the name of the company that I came

10    up with at the time and in any documentation -- it's

11    just -- I guess that's my background. That's my

12    field. And I went in not -- with little knowledge of

13    what I could do and couldn't do.

Page 8

14 Q    When you say you went in with little knowledge of what
15      you could and couldn't do, from where did you obtain
16      this knowledge?
17 A    I'm a paralegal -- certified paralegal and I worked in
18      several law firms and I just thought that this would
19      be okay for me to do and when I named it -- because
20      that's my background and some of the things that I've
21      done.
22 Q    When you say you thought this would be okay to do, did
23      you do any research into what legal restrictions there
24      would be on you?
25 A    You know, I did research but I didn't research enough

                Q & A COURT REPORTING (248) 681-2499

                                                        10


1       into Michigan laws.
2  Q    What research did you do?
3  A    I did a lot of research regarding -- through the
4       Internet, I made phone calls to several entities and
5       from my understanding it was a great idea, go for it
6       and that's what I done.
7  Q    Where on the Internet did you get this information
8       from?
9  A    Now, that was years ago.  I searched.  I just
10      searched.
11 Q    You can't recall any source of this information?
12 A    Not at this moment.
13 Q    Did you do anything to ascertain whether that
14      information from the Internet was reliable?
15 A    Well, yes, through several researches.
                    Page 9

16  Q    What do you mean by that?

17  A    Meaning I just continued to research and I found it

18       would be okay.  I just didn't know that in Michigan we

19       could not have the word legal in there.  There are

20       other states that I'm finding out that actually do

21       what I do and it's okay for them to do it.  So I was

22       just a little misinformed and lack of knowledge on how

23       to set up this business, how to operate the business,

24       within the laws.

25  Q    You also said that besides the Internet you made some

                    Q & A COURT REPORTING (248) 681-2499

 1       phone calls?

 2  A    Correct.

 3  Q    To whom?

 4  A    To several individuals that I know and just talked to

 5       them about my idea.

 6  Q    Who were they?

 7  A    I spoke to -- I'm not going to divulge that

 8       information.

 9  Q    The question I'm asking is who were these several

10       individuals you spoke to?

11  A    They were friends and colleagues, if you will.

12  Q    Okay.  What are their names?

13  A    I can't divulge that name.  I refuse to.

14  Q    What's your basis for refusing?

15  A    I have none, actually.

16  Q    What did they tell you?

17  A    It's a great idea, go for it, a lot of people out here
                    Page 10

18      would need that type of help.

19  Q   Did they tell you whether it was legal in Michigan?

20  A   Well, they -- no.  They didn't say it was legal nor

21      did they say it was not legal.  They stated that do

22      you understand that you can't give legal advice.  I

23      said yes.  Do you understand you can't represent

24      anybody?  Yes.  Do you understand that you cannot give

25      a retainer -- you can't quote them a retainer's fee or

Q & A COURT REPORTING (248) 681-2499

1       anything like?  I said yes, I do, I understand all of

2       that.  And that is something that everyone knows when

3       they come into the door so they make it preprinted

4       information that I may find or locate doing my own

5       research on actually other sites or if I go to

6       community services, they have information.  So it's

7       basically a company that just helps give out

8       information to help individuals.

9   Q   Wait.  This is your company?

10  A   Uh-huh.

11  Q   Is that a yes?

12  A   Yes.

13  Q   Your company is a company that gives out information

14      to help individuals; is that what you're saying?

15  A   Yes.  Not just any --

16  Q   You charge for it, right?

17  A   -- information.

18          No.  I charge for preparing documents.

19  Q   And you give out the information for free?

Page 11

20  A    Of course.

21  Q    Did you prepare documents in Ricky Carpenter's case?

22  A    I prepared -- assisted him with the -- his documents

23       for bankruptcy.

24  Q    What did you do to assist him?

25  A    Type it in.

Q & A COURT REPORTING (248) 681-2499

13

1   Q    How much did you charge him for that?

2   A    Nothing for the bankruptcy.

3   Q    What did you charge him for?

4   A    I charged him for all the other items.

5   Q    What were the other items?

6   A    The other items were dealing with his home

7        foreclosure, which I'm not going to divulge into that,

8        preventing him from losing his property.

9   Q    Any other items?

10  A    No.  That's what he came to us for.  Oh, and pulling

11       his credit report for him.

12  Q    So what did you do to prevent him from losing his

13       property?

14  A    We're still in the process.  It's a long process.

15  Q    And you're charging him for it?

16  A    Not anymore.

17  Q    How much did you charge him?

18  A    I charged him -- well, it's on there.

19            What does it add up to?

20  Q    When say there, you're talking about the third page

21       that says the DMB Self-Help Legal Information Network?

Page 12

22  A    Eight fifty.

23  Q    Okay.  So your charge was $850; is that right?

24  A    Correct.

25  Q    And what do you do for the $850?


Q & A COURT REPORTING (248) 681-2499


14


1   A    We do several things and I'm not going to divulge how

2        I do, what I do, regarding the home foreclosure

3        prevention program.

4   Q    What did you do for Mr. Carpenter for the $850?

5   A    I'm still assisting him.  We are still in the process.

6   Q    What are you doing to assist him?

7   A    I'm helping him to prevent him from losing his

8        property.

9   Q    How are you doing that?

10  A    Through several ways that I'm not going to divulge.

11  Q    What's your basis for not divulging that?

12  A    Because that's between my client and I.  We are here

13       based upon the Chapter 7 bankruptcy and not for the

14       other programs that I offered him.

15  Q    Okay.  What's your legal basis for not answering the

16       question?

17  A    I want to make sure I'm in the right of what I'm doing

18       because it appears that things are coming at me that I

19       don't understand and I just want to make sure before I

20       speak or say anything that I'm protected myself.

21  Q    What do you mean by protected?

22  A    I want to make sure that I'm in the right and I'm

23       doing what's right in the law -- under the law here in

24      Michigan.  So if we're here for the bankruptcy, let's
25      divulge and talk about that but as far as the other

1       programs he has not even given me permission to give
2       out all of his information.
3   Q   What information do you have from him that you think
4       you need his permission to give out?
5   A   I have other documents pertaining to his property.
6   Q   Did you bring those with you?
7   A   No, I did not.
8   Q   Why not?
9   A   Because that's not part of this particular case.
10  Q   You charged Mr. Carpenter, correct?
11  A   Correct.
12  Q   And Mr. Carpenter is a debtor in bankruptcy, correct?
13  A   Correct.
14  Q   You appeared at a hearing in front of Judge Shefferly,
15      correct?
16  A   Correct.
17  Q   And Judge Shefferly told you about his concerns about
18      you charging Mr. Carpenter and Mr. Carpenter being a
19      debtor in bankruptcy, right?
20  A   He discussed his concerns, yes, he did.
21  Q   And you think that this deposition has nothing to do
22      with that; is that what you're saying?
23  A   That's what I do believe.
24  Q   Do you have a basis for believing that?
25  A   Yeah.  I believe I'm under the impression that I'm

1        here based on this court believing that I charged
2        Ricky Carpenter more than what I should have charged
3        preparing his bankruptcy paperwork.
4    Q   You're refusing to answer my question?
5    A   Yes.
6    Q   Do you have a legal basis for refusing to answer my
7        question?
8    A   At this moment, no.
9    Q   You're refusing to produce the documents involving the
10       other services you provided for Mr. Carpenter?
11   A   Yes.
12   Q   Do you have a legal basis for that?
13   A   Without his permission -- I mean, what's wrong with
14       privacy?  This is a contract between myself and my
15       client.
16   Q   What makes you think you need his permission?
17   A   Because we signed confidentiality statements.
18   Q   Do you have a copy of the confidentiality statement?
19   A   No.  I don't have that with me.
20   Q   Well, do you have some reason to believe that your
21       confidentiality statement trumps the Court's order?
22   A   No.  Maybe not.
23   Q   So where is the document?
24   A   I don't have it.
25   Q   Where is the confidentiality statement?

1  A   I don't have them.

2  Q   Why don't you have them?

3  A   Because I didn't bring them.

4  Q   Why didn't you bring them?

5  A   I didn't pick it up, didn't put it in here.  They're

6      still at the office.

7  Q   You knew that the court order required that you bring

8      all the documents, correct?

9  A   Correct.

10 Q   But you thought you didn't have to bring it because of

11     your confidentiality statement?

12 A   And I, also, thought that I shouldn't have to bring

13     them based on what I'm here for so I believe that was

14     something separate.  So if I'm incorrect, I'm

15     incorrect.

16 Q   What are the consequences of you being incorrect?

17 A   Really there aren't any consequences, I believe.

18 Q   Did you get legal advice that told you that you didn't

19     have to bring the documents today?

20 A   No.

21 Q   Did you seek legal advice about which documents you

22     had to bring today?

23 A   No.

24 Q   Did you seek legal advice before you created your

25     disclaimer that has the word legal in it?

1  A    No.

2  Q    Why not?

3  A    Because I really thought that I was right, I didn't

4       have to.

5  Q    What's your basis for thinking it was right?

6  A    My basis is my own thinking.  That's my basis.

7  Q    Other than your own thinking, what's your basis for

8       thinking anything you're doing is legal?

9  A    Based on other things that I took a look at -- into,

10      individuals that I spoke with, who stated that it was

11      a great idea, so as far as hiring someone to do the

12      background for me and then take a look into to making

13      sure it was legally structured I did not do that

14      properly.

15 Q    Did you do it at all?

16 A    On my own basically.

17 Q    What did you do on your own to make sure you were

18      behaving in a legal way?

19 A    Trying to make sure that I wasn't doing the main three

20      things that I knew I couldn't do, which was give legal

21      advice and represent them in court and, also, quote

22      them a retainer's fee, etc., so those things I knew I

23      couldn't do.  I just didn't understand about legal --

24      the word legal in the document and everywhere else at

25      the time that it was structured.  So as I go on every

                                                    19


1       day I'm learning more and more what to do and what not

  2      to do.

  3  Q   And you intend to continue providing the same services

  4      you've been providing, correct?

  5  A   No.  I actually did some revamping.

  6  Q   What have you changed?

  7  A   What have I changed?  I pretty much -- because of this

  8      I'm trying not to do any -- I'm not doing any --

  9      preparing any documents for bankruptcies until this

 10      matter is cleared.  I'm not sure how to actually go

 11      about anything right now.

 12  Q   When you say anything, you mean anything related to

 13      bankruptcy?

 14  A   Correct, because this is all new to me.  I looked

 15      up -- what is it?  In one of the Complaints it states

 16      a DRA and I said I'm not qual -- I'm not that but then

 17      when I looked up what the law requires -- under

 18      federal law what a DRA is and then they do put me in

 19      there even though I don't say that I'm one of those,

 20      so I'm learning as I go through this whole process.

 21  Q   Do you know what a DRA is?

 22  A   Debt relief agency.

 23  Q   You think you're not one?

 24  A   Well, I didn't think -- according to you all -- not

 25      you all but according to what I read I realized I am


                Q & A COURT REPORTING (248) 681-2499


                                                        20


  1      but that's not what I was doing when I started this.

  2  Q   When did you realize you were a debt relief agency?

  3  A   This actually -- I didn't say I realized I was a debt

                          Page 18

 4      relief agency.  I realized that under what I found

 5      under the bankruptcy's (sic) laws that they classified

 6      a document preparer under the debt relief agency and I

 7      just found this out two days ago.  So even in my

 8      Complaints you can see when I stated that I denied

 9      because I didn't know.

10  Q   So in your answer to the Complaint you denied being a

11      debt relief agency; is what you're saying?

12  A   Yeah.  I didn't know that this was --

13  Q   And now you know that that's not accurate?

14  A   I know that under the bankruptcy law that they

15      classify me as that.

16  Q   Why didn't you look that up before you signed your

17      answer?

18  A   I actually -- I really looked everywhere.  I don't

19      know why I didn't look it up.  Someone was supposed to

20      assist me.  They didn't.

21  Q   Who is that someone?

22  A   Donna Bettis.

23  Q   Is she an attorney?

24  A   Yes.

25  Q   Did you pay her?

Q & A COURT REPORTING (248) 681-2499

 1  A   No.

 2  Q   All right.  I'm going to ask you to take a look at the

 3      third page of the documents you provided.  Handwritten

 4      in here it says services to be provided, Chapter 7

 5      bankruptcy, parenthesis free consult.  Do you see

```
 6       that?
 7   A   Uh-huh.
 8   Q   Is that a yes?
 9   A   Yes.
10   Q   What does that mean?
11   A   That means his Chapter 7 is free and his consult was
12       free and -- do you want me to go further?
13   Q   Well, what does consult mean?
14   A   When you come in, sit down and talk.
15   Q   Talk about what?
16   A   His home prevention stuff.
17   Q   What were you doing for the Chapter 7?
18   A   He wanted me to -- he brought all his paperwork and me
19       to fill it in.
20   Q   Did you do that?
21   A   Yes.
22   Q   All right.  Then here it says foreclosure prevention;
23       is that right?
24   A   Yes.
25   Q   What did you do for that?
```

Q & A COURT REPORTING (248) 681-2499

22

```
 1   A   I'm still working on it.
 2   Q   What did you do, though?
 3   A   We assist him in keeping his property.
 4   Q   What steps do you take?
 5   A   We communicate with banks.  We communicate with -- we
 6       negotiate for him on his behalf along with providing
 7       everything that they need.
```

Page 20

```
 8  Q   When you say we, that's the company?

 9  A   Correct.

10  Q   Is there anybody there besides you?

11  A   Of course.   Staff.

12  Q   How many staff members?

13  A   One.

14  Q   And does that individual do some of the negotiating?

15  A   No.

16  Q   It's all you?

17  A   Yes.

18  Q   What does the staff member do?

19  A   Answer my phones, administrative work.

20  Q   You mentioned that you are a paralegal, correct?

21  A   Yes.

22  Q   Where did you get your certification?

23  A   Washington School For Paralegals in New York.

24  Q   When did you do that?

25  A   2007, I believe.  No.  No.  No.  No.  Six.
```

Q & A COURT REPORTING (248) 681-2499

```
 1  Q   Were you living in New York at the time?

 2  A   No, here.

 3  Q   Did you do it through correspondence or on-line?

 4  A   Uh-huh.   Yes.

 5  Q   Is that a yes?

 6  A   Yes.

 7  Q   Was it on-line?

 8  A   Yes.

 9  Q   And do they give you some type of degree or
```

Page 21

10      certificate?

11  A   Yes.

12  Q   Do you have any other training as a paralegal, other

13      than on the job, which we'll talk about later?

14  A   No.

15          Other than on the job, meaning what I do

16      now?  I mean, I worked for other law firms.

17  Q   Well, I'm about to ask you about the work for law

18      firms but I want to ask about school first.

19  A   Okay.

20  Q   So as far as school goes this is what you have,

21      correct?

22  A   Yes.

23  Q   Do you have any other degrees before you went to

24      paralegal school?

25  A   Before, no.  No, not related to any of this.


                    Q & A COURT REPORTING (248) 681-2499


                                                            24


1   Q   Well, do you have any other college of any kind?

2   A   Ministerial.

3   Q   Do you have a degree in ministerial?

4   A   We get certifications, get certified.

5   Q   Where is that from?

6   A   That is from Cogic Church of God in Christ and, also,

7       United Methodist.

8   Q   So the Church of God in Christ -- did somebody certify

9       you as a minister?

10  A   Yes.

11  Q   When was that?

                    Page 22

12  A   Oh, a long time ago.  Years ago.

13  Q   More than 10 years ago?

14  A   Yes.

15  Q   And then the United Methodist Church?

16  A   That was probably -- it was in the 19 -- I'll say 1992

17      possibly.

18  Q   So roughly then?

19  A   Yeah.

20  Q   And what, did you get some type of certificate as a

21      minister for the United Methodist Church?

22  A   Yes.

23  Q   And which one came first?

24  A   Methodist.

25  Q   Have you ever worked as a minister?

Q & A COURT REPORTING (248) 681-2499

25

1  A   It depends on what you classify --

2  Q   Have you ever worked as a minister for either the

3      Church of God in Christ or the United Methodist

4      Church?

5  A   Within the ministry that I was attending, yes.

6  Q   Did you get paid for that?

7  A   No.

8  Q   Okay.  Have you ever worked as a minister for any

9      other organization?

10  A   No.

11  Q   Okay.  You said you've worked for some lawyers,

12      correct?

13  A   Correct.

Page 23

14  Q   When was the first time you worked for a lawyer?

15  A   The year of -- wow.   Probably 2005.

16  Q   What was the name of the firm?

17  A   Law Office of Jorin Rubin.

18  Q   I'm sorry.   Can you say that, again?

19  A   Law Office of Jorin Rubin.

20  Q   Do you know how to spell Jorin?

21  A   J-O-R-I-N.

22  Q   What type of law did -- is that a Mr. or Miss Rubin?

23  A   Ms.   Family.

24  Q   She did family law?

25  A   Uh-huh.

Q & A COURT REPORTING (248) 681-2499

26

1   Q   You have to answer --

2   A   Yes.   I'm sorry.

3   Q   Approximately how long did you work there?

4   A   For three and a half, four years.

5   Q   Where did you work after that?

6   A   ADAM.

7   Q   That's the American Divorce Association For Men?

8   A   Correct.

9   Q   And that's actually a law firm?

10  A   Right.

11  Q   What are the lawyers' names?

12  A   Oh, it's several.   I'm just -- John Midtgard, Brent

13      Bowyer.

14              Or who I worked with?  Do you want to do it

15      that way?

Page 24

16  Q    Well, why don't we start with what lawyer did you work

17       with in that firm?

18  A    Okay.  Jeff -- oh, God.  He had a -- he has a Polish

19       last name.  I can't think of his last.

20  Q    So that would be --

21  A    It's all in the same office.

22  Q    It would be approximately 2008 or 2009 that you

23       started there?

24  A    Let me see.  Where did I say I was -- 2008.

25  Q    Approximately how long did you work there?

Q & A COURT REPORTING (248) 681-2499

27

1   A    I worked there about 11 months maybe.

2   Q    Did you work for any other lawyers?

3   A    Spindler & Stern.

4   Q    And was that after ADAM?

5   A    Correct.

6        And that was maybe two months.

7   Q    What type of law did they do?

8   A    General.

9   Q    Did you work with one of the particular lawyers?

10  A    Yeah, Lisa Stern.

11  Q    Is she the Stern in Spindler & Stern?

12  A    Correct.

13  Q    You said she did general practice?

14  A    Right.  They did several things there.

15  Q    Was bankruptcy one of the things?

16  A    No.

17  Q    And you said you only worked there two months; is that

Page 25

18      right?

19  A   Right.

20              And the same with Pazner Law Firm.   All

21      layoffs by the way.

22  Q   When you say layoffs, you mean they just didn't have

23      enough work to keep you?

24  A   That's when the economy hit.

25  Q   Approximately when did you work for the Pazner Law

                Q & A COURT REPORTING (248) 681-2499

                                                        28


1       Firm?

2   A   It had to be 2009.   No.   Let me see.   Let me see.

3       This is '11, right?   Yeah, 2009.

4   Q   What type of work did the Pazner Law Firm do?

5   A   Family law.

6   Q   Any other law firms after Pazner?

7   A   No.

8   Q   What's Pazner's first name?

9   A   Eric.

10  Q   Were there any lawyers in the firm?

11  A   Himself and he had hired a female.   I can't remember

12      her name.

13              MR. RANDEL:   Please keep your voice up so

14      she can hear you.

15              THE WITNESS:   Oh, that female.   I can't

16      remember her name.

17  Q   (By Mr. Randel):   After the Pazner Law Firm is that

18      when you formed your entity?

19  A   Yes.

                        Page 26

20  Q    How do you market your company?

21  A    How do I market?  I have a site up.

22  Q    When you say a site, you mean a Web site?

23  A    Web site, uh-huh.

24       And just word of mouth.

25  Q    What's your Web site address?


Q & A COURT REPORTING (248) 681-2499

29

1   A    Dmbselfhelpservices.org.

2   Q    Is it www?

3   A    Uh-huh.

4   Q    Is that a yes?

5   A    Yes.

6   Q    Www.dmbselfhelp -- is that all one word?

7   A    Correct.

8        Services.org.

9   Q    Are there any dashes or anything?

10  A    No.   No.

11  Q    Do you have any other domain names?

12  A    No.

13  Q    Do you continually update the Web site?

14  A    I haven't had time but I need to.

15  Q    What do you mean by you need to?

16  A    Because things change and I want to -- I don't like

17       it.  I don't like my Web site.

18  Q    Do you still advertise bankruptcy services on that

19       site?

20  A    I haven't changed anything.

21  Q    Is that a yes, then?

Page 27

22  A    Yes.

23  Q    Are you still providing bankruptcy services?

24  A    No.

25  Q    And you're not while this plays out; is that right?


Q & A COURT REPORTING (248) 681-2499

30


1   A    Pardon me?

2   Q    And you're not while this plays out; is that what

3        you're saying?

4   A    Yeah.  That's what I'm saying.  I'm not going to do

5        this until I need to know what I should do and

6        shouldn't do.

7   Q    You incorporated the business about July of 2009; does

8        that seem right?

9   A    Yes.

10  Q    All right.  Do you refer any of the people that come

11       to your business to attorneys?

12  A    Yes.

13  Q    Under what circumstances do you refer people to

14       attorneys?

15  A    I can't do what they ask me to do.  I only do document

16       preparation.  They want help beyond what I can do.

17       They want advice and I can't do all those things.

18  Q    Who are the attorneys you refer people to?

19  A    I will refer to the attorneys that I worked with.

20       Jorin Rubin would be the main one I refer to.

21  Q    Well, she does family law, correct?

22  A    Uh-huh.

23  Q    Is that a yes?

Page 28

24   A   Yes.

25       Some people come in for situations on that.


Q & A COURT REPORTING (248) 681-2499


31


1        Also, I was referring to Donna Bettis.

2    Q   What types of cases were you referring to Donna

3        Bettis?

4    A   It varies.  Whether they take the case or not I don't

5        know but I know I can't help the people.

6    Q   If you have somebody who needs bankruptcy help and

7        they need an attorney, who do you refer them to?

8    A   I refer them to Donna Bettis.

9    Q   In addition to people who need bankruptcy help, do you

10       refer people who need other types of help to Donna

11       Bettis?

12   A   Yes.

13   Q   All right.  When was the last time that you helped

14       somebody with a bankruptcy?

15   A   It's actually been possibly around -- maybe after

16       my -- during the time I was first here meaning

17       Shefferly, during Carpenter's show cause hearing, so

18       around there.

19   Q   So I think in about March you went in front of Judge

20       Shefferly on Mr. Carpenter's show cause hearing,

21       right?

22   A   Uh-huh.

23   Q   Is that a yes?

24   A   Yes.

25   Q   And since then you haven't helped people with

Page 29

1       bankruptcy; is that right?

2   A   I've had individuals whose paperwork was already done

3       and waiting on them to come and get them so they can

4       have them filed so if they came after that, everything

5       is complete but it's just we have to sign it all and

6       if I did it, my name is going to go on there.

7   Q   Approximately how many people is it in that category?

8   A   I'm thinking two.

9   Q   How many people have you done total?

10  A   Oh, I don't know.  Not that many.

11  Q   Well, not that many 10 or not that many 50?

12  A   Oh, not that many 10, not 50.  Oh, gosh.

13  Q   So you're saying 10 or fewer is the number of cases

14      you've handled?

15  A   I would say that, yes.

16  Q   And most of those people were charged a hundred

17      dollars; is that right?

18  A   Yes, or less.  I think a couple of them was like $75.

19      Not much.

20  Q   What percentage of your business did the bankruptcy

21      make up before you stopped doing it?

22  A   Very small.  I'll say maybe one percent.

23  Q   Do you have any other clients like Mr. Carpenter where

24      you did their bankruptcies but contend that you

25      charged for something different?

1  A    No.

2  Q    All right.  At one point you had a business card that

3       looked like this; is that right?

4  A    Yes.  That was in the very beginning.

5            MR. RANDEL:  I should probably mark this,

6       then.

7            (Deposition Exhibit No. 1 was marked for

8            identification)

9  Q    (By Mr. Randel):  Take a look at what we've marked as

10      Exhibit 1.  At one time that was your business card,

11      right?

12  A    Right.

13  Q    And I'm guessing you've made some changes; is that

14      right?

15  A    Of course.

16  Q    Approximately when did you prepare that business card?

17  A    This business card was prepared in 2000 and I'll say

18      eight -- 2008 before the incorporation.

19  Q    And then you've changed that card; is that right?

20  A    Of course.

21  Q    When did you make that change?

22  A    After I found out that I couldn't do -- have the word

23      legal through the State of Michigan.

24  Q    Do you remember approximately when that was?

25  A    When I incorporated.

```
 1  Q   How many of these business cards did you have made?
 2  A   I did it through Vistaprint  It was like 250 you get
 3      for free.
 4  Q   And do you have a different business card now?
 5  A   Yes.
 6  Q   Do you have one with you?
 7  A   Possibly.  Possibly.  I don't know.  I might not have
 8      any on me.
 9  Q   All right.  That's okay.  I'll just ask you a few
10      questions about this.
11  A   Okay.
12  Q   What change did you make to this business card for
13      your new business card?
14  A   My -- the name of the company is the same except for
15      the word legal; it's out.  The whole picture has
16      changed, whole format.  Address is still the same.
17      Name is the same.  Consultant is the same.  Phone
18      number is the same.  My e-mail and Web site are
19      different.
20  Q   What's different about them?
21  A   What's different is my e-mail is now
22      dmbselfhelpservices@yahoo.com and my Web site is
23      dmbselfhelpservices.org.
24  Q   And so the domain name on this business card, the
25      www.dmblegalself-helpnetwork.org, you don't use
```

```
 1      anymore?
 2  A   Correct.
```

    3   Q    When did you stop using it?

    4   A    When I realized everything I had to change because of

    5        the word legal.

    6   Q    Is the Web site still active?

    7   A    Yes.

    8   Q    So if somebody comes across that Web site, they can

    9        still find you?

   10   A    Under dmbselfhelpservices.

   11   Q    If somebody typed in the domain name --

   12   A    No.

   13   Q    -- on this business card --

   14   A    No.  The company that did the domain name -- they

   15        changed it so if --

   16   Q    Approximately when?

   17   A    Oh, you want a day and time?

   18   Q    Well, start with a month.

   19   A    Oh, the month.  It wasn't long ago.  It wasn't long

   20        ago.  It was this year.

   21   Q    Well, we're in May now, right?

   22   A    Right.

   23            So I'm thinking maybe February -- no,

   24        March.  Maybe around March when I came here and I

   25        realized that.


                  Q & A COURT REPORTING (248) 681-2499


                                                                36


    1   Q    What was your basis for thinking you made the change

    2        approximately February or March?

    3   A    Because it was soon and I don't -- I cannot recollect

    4        at this time so I'm just assuming.
                              Page 33

5  Q   Did you make any other changes to your Web site

6      content, other than changing the domain name?

7  A   No; just added some stuff like events of some sort.

8      Nothing much.

9  Q   As far as you know your Web site still says bankruptcy

10     service, correct?

11 A   Correct.  I don't believe the services were changed on

12     there yet.

13            Like I stated before, we -- I haven't had

14     time to go through there and do it let alone hire

15     somebody to do it.

16 Q   Well, when you say you haven't had time, you mean

17     you're busy doing other things?

18 A   Yes.

19 Q   And those other things are your business; is that

20     right?

21 A   No.  I do more than just my business.  I'm in ministry

22     so I do quite a bit of stuff.

23 Q   Is your ministry connected to this business we're

24     talking about?

25 A   Somewhat, yes.


                Q & A COURT REPORTING (248) 681-2499


                                                        37


1  Q   What does that mean?

2  A   In the fact of helping people and encouraging them

3      just to not be afraid and do things that they can do.

4  Q   Well, do you have any other corporations besides this

5      one?

6  A   No.

                        Page 34

7  Q    Do you make any money as a minister?

8  A    No.  Depending.  If I have speaking engagements, they

9       do give us an offering.

10  Q   Have you had any speaking engagements in 2011?

11  A   Not -- no, I haven't.

12  Q   In 2010 did you have one or more?

13  A   Yes.

14  Q   So you made some money as a minister through speaking

15      engagements in 2010, correct?

16  A   Yes.

17  Q   And in 2011 you haven't made any money as a minister?

18  A   No.

19  Q   Other than this business, do you have any other

20      sources of revenue?

21  A   No.

22  Q   This business is set up as a for profit enterprise,

23      right?

24  A   Correct.

25  Q   You don't hold the business out as a ministry, do you?

Q & A COURT REPORTING (248) 681-2499

                                                            38

1  A    No.  It's complicated.  There's nowhere ministry in

2       there, period, but it's just who I am.

3  Q    Well, you said you had a radio show, right?

4  A    Correct.

5  Q    And the radio show is about the DMB Self-Help

6       business, not about your ministry, correct?

7  A    Actually, it's both, one and the same.  It's hard to

8       explain.  It's a ministry and what we do is we just

Page 35

```
 9       help individuals and yes, the business is for profit
10       and which actually helps support ministry work.
11  Q    When you say the business helps support ministry work,
12       what do you mean by that?
13  A    Meaning I -- anything that I have or what I do whether
14       it's through works or any finances I supported our
15       ministry and the ministry that I belong to.
16  Q    Does the business keep books separate from your
17       personal books?
18  A    I use the same account for everything, though.
19  Q    So you're saying that if you make some money through
20       the business that enables you to do some of your
21       ministry work?
22  A    I give from the business to the ministry.
23  Q    What's the --
24  A    Let me make this clear:  I don't utilize my funds
25       through the company to go out and do ministry.  I
```

39

```
 1       give.
 2  Q    Would you take a look --
 3                MR. RANDEL:  Actually, why don't we mark
 4       that as Exhibit 2.
 5                (Deposition Exhibit No. 2 was marked for
 6                identification)
 7  Q    (By Mr. Randel):  Would you take a look at this?
 8  A    Uh-huh.
 9  Q    That is a page from your Web site, correct?
10  A    Correct.
```

11  Q    And in here it talks about accepting donations, right?

12  A    Correct.

13  Q    Does your company take donations?

14  A    We haven't yet, no.

15  Q    But your Web site says you will take donations; is

16       that right?

17  A    Yes, we will.

18  Q    But no one has made a donation?

19  A    Not yet, no.

20            Do you want some more clarity on this?

21  Q    Well, I'm going to ask a few questions.

22            It says all donations are tax deductible

23       with two exclamation points, right?

24  A    Correct.

25  Q    Is that true?

Q & A COURT REPORTING (248) 681-2499

40

1  A    Yes.

2  Q    How would donations to your company be tax deductible?

3  A    Because I also have a company, which they're

4       nonprofit, that I'm allowed to be under their umbrella

5       for donations.  It's ministry purposes.  Totally

6       separate.

7  Q    What's the name of that company?

8  A    Do I have to divulge that, too?

9  Q    Yes, you do.

10  A    Oh, okay.  That company is -- oh, gosh.  I don't have

11       that with me and it's in my phone but it's off.

12  Q    Do you own that company?

Page 37

13  A    No.

14  Q    Who does?

15  A    Her name is Mary.

16  Q    What's Mary's last name?

17  A    Blanch.

18  Q    Is that company a 5013(c) corporation?

19  A    Yes.

20  Q    And your company is not, correct?

21  A    Correct.

22  Q    And your contention is that this invitation for people

23       to make tax deductible donations to DMB for its work

24       is based upon being under the umbrella of this other

25       company?

Q & A COURT REPORTING (248) 681-2499

41

1   A    Yes.

2   Q    Does Mary Blanch know you're running a for profit

3        enterprise and claiming that you can take tax

4        deductible donations?

5   A    Yes.  I asked her.  She said okay.

6   Q    And the plan would be that if somebody made a donation

7        to DMB believing it was tax deductible, what would DMB

8        do with that money?

9   A    It would help people who can't afford or even want to

10       get services so we don't have to do everything for

11       free.  There are a lot of people out here, who need

12       help, and they don't have anything.

13  Q    So the plan would be that the money would go --

14       somebody's donation would go to DMB, correct?

Page 38

15  A    Uh-huh.

16  Q    Yes?

17  A    Yes.

18  Q    And DMB would take a client and the client wouldn't

19       have to pay the fee, the donation would pay the fee?

20  A    Correct.

21  Q    And the fee would be deposited in DMB's account,

22       right?

23  A    No.  It goes to the nonprofit.

24  Q    Is that reflected on the Web site anywhere?

25  A    No.  Now that you bring it up it's a thought.

Q & A COURT REPORTING (248) 681-2499

42

1   Q    If somebody made a donation to DMB, who would they

2        tell the taxing authority they made the donation to?

3   A    To the nonprofit.

4   Q    How would they even know about the nonprofit?

5   A    The nonprofit -- because we would discuss -- we would

6        disclose that information.  The nonprofit --

7   Q    What the statement says here at DMB Self-Help we

8        appreciate any size donation that will enable us the

9        ability to assist those who cannot afford our services

10       and need help to advance to the next level of success,

11       right?  That's what it says, right?

12  A    Yes.  Uh-huh.

13  Q    If somebody made a donation to DMB, they could do it

14       by credit card, right?

15  A    Right.

16  Q    And then when they report it on their taxes that they

Page 39

17          made the tax deductible donation, what would they

18          report?

19  A    Oh, I see what you're saying.  Okay.  I see.

20  Q    Do you see the problem?

21  A    Yes, I do.

22  Q    Have you looked at this before today?

23  A    No.

24  Q    Who types all this when it got onto the Web site?

25  A    Well, I do and my administrative assistant.  We do

                    Q & A COURT REPORTING (248) 681-2499

                                                            43

1          things.

2                  I see exactly what you're saying so even

3          though in my mind and with the entity -- the nonprofit

4          entity -- how we're thinking when you read it like

5          that, it doesn't come across that way nor -- oh, I'm

6          just talking.

7   Q    At one point you received a Notice for your deposition

8          in this case, right?

9   A    Right.

10  Q    And some time thereafter you signed your own Notice,

11          correct?

12  A    Correct.

13  Q    What made you think you could do that?

14  A    I got information from someone.  It was just all

15          wrong.  Just all wrong.

16  Q    Well, you're saying you --

17  A    That in a deposition both -- normally in a

18          deposition -- and see, I'm beginning to understand
                              Page 40

19          this is a totally different law, totally different

20          court.

21   Q    We're talking about bankruptcy court now, right?

22   A    Right.

23   Q    And as you sit here now you're saying you're beginning

24          to understand you're in bankruptcy court, right?

25   A    Yes.


                    Q & A COURT REPORTING (248) 681-2499


                                                                44


1    Q    And as you sit here now you recognize that bankruptcy

2          court had rules that you may not have had in family

3          court?

4    A    Yes.

5    Q    Don't you think you should have done that before you

6          started charging people?

7    A    Yes.

8    Q    In addition to this show cause order from the judge,

9          you're defending some adversary proceedings, right?

10   A    Correct.

11   Q    And you have -- no attorney has filed an appearance in

12          any of your cases?

13   A    Yeah.  I just found out that.

14   Q    Have you paid any attorneys?

15   A    No.

16   Q    And did you think you had an attorney-client

17          relationship with any attorneys in those other cases?

18   A    Yes.

19   Q    Have you been getting advice?

20   A    No.  Well, the attorney, who was supposed to represent

                        Page 41

21      me, had gave me advice and was actually going to be in

22      court that day but got sick and that attorney is Donna

23      Bettis.

24   Q   That's in one of the adversary proceedings?

25   A   In one of the adversary proceedings in which I had

Q & A COURT REPORTING (248) 681-2499

45

1       actually e-mailed you because I hadn't heard from her

2       and I was respond -- I kept calling and texting and

3       e-mailing and I got no response when I corresponded

4       with you to find out if they filled out the appearance

5       and contributed my answer.

6    Q   It sounds like you're contending that bankruptcy

7        always was a very small part of your business; is that

8        right?

9    A   Correct.

10   Q   And the larger part of your business has to do with

11       foreclosure prevention?

12   A   Possibly, and, I mean, several things.  It's no big

13       thing.  We're a very small company.  We make very

14       little money.  We don't do a lot of -- a lot of it is

15       ministry work and that's it.  It's not a very

16       lucrative business.  We get quite a few people, who

17       sometimes just want to talk.

18   Q   Do you charge them for that?

19   A   No.

20   Q   You have an office location, correct?

21   A   Correct.

22   Q   Does the business pay rent to that location?

Page 42

23  A    Yes.  I sublease.

24  Q    What type of business do you sublease from?

25  A    No.  No.  No.  When I got the office, I used whatever

Q & A COURT REPORTING (248) 681-2499

46

1        monies I had to get the office.  Then after awhile I

2        subleased out a couple of my offices to different

3        entities.

4   Q    So what do you have to pay to the landlord, then?

5   A    My whole -- I have to pay the whole rent.

6   Q    How much is that?

7   A    Oh, seven ninety.

8   Q    Per month?

9   A    Yes.

10  Q    And then you sublease some space to some others; is

11       that right?

12  A    Correct.

13  Q    Is the landlord the building owner?

14  A    They're in receivership so they --

15  Q    Do you pay the receiver?

16  A    We still pay it to the management and whoever they

17       give it to.

18  Q    And you don't have any ownership interest to the

19       manager or the --

20  A    Oh, no.

21  Q    And then you sublease to how many different people?

22  A    Three.

23  Q    Do any of them do anything related to the same type of

24       work?

Page 43

25  A    No.  They're totally separate.

 1  Q    Are any of them attorneys?

 2  A    No.

 3  Q    What type of business are they?

 4  A    Oh, insurance and wiring -- telecommunications.

 5  Q    All three?

 6  A    Yes.  Yes.  All three are telecommunications and

 7       insurance.

 8  Q    Do you provide copier and receptionist services for

 9       them --

10  A    No.

11  Q    -- as part of the sublease?

12  A    No.  They bring their own.

13  Q    All right.  So what do you receive --

14  A    They pay me one flat fee to rent the office.

15  Q    And the three total -- what do they pay?

16  A    My rent.  About a hundred dollars.  About a hundred

17       dollars.  Yes.

18  Q    You get a hundred dollars from each?

19  A    No.  I get about $300 from each.

20  Q    So if they all pay, you've actually got your rent

21       covered?

22  A    Yes, because my company does not bring in money like

23       that.  Remember --

24  Q    Do you intend to do bankruptcy going forward?

25  A    If the Court allows me after several changes and I get


Page 44

1    some really clear understanding on the law.  I don't
2    mind doing the documents.  I don't mind helping the
3    people.  If the Court will allow me to continue, I
4    would.  If they find some reason why -- what I did --
5    why I did anything wrong in regards to preparing their
6    documents, I need to know.  I'm not --
7  Q  Where do you expect to get this clear understanding?
8  A  I expect to get it here --
9  Q  From me?
10 A  -- in court.
11        No.  I -- no.
12 Q  From the judge?
13 A  And from myself and from an attorney, who I just
14    called the other day when you told me no, there was no
15    appearance and I went hunting.
16 Q  That attorney is somebody, other than Miss Bettis?
17 A  Oh, yes.
18 Q  Have you retained that attorney?
19 A  We were trying to -- they called me all day yesterday
20    and I didn't even know they called but I sent them
21    over everything that I have.  They are familiar --
22    actually, they're bankruptcy attorneys so they're
23    familiar with it and that's how I found out about the
24    ADR (sic).
25        What did I say?

1  Q   The debt relief agency?
2  A   Yes.
3  Q   But the Complaints assert that you're a debt relief
4      agency and you've gotten those at least a month ago,
5      right?
6  A   I know, and I just said no, I wasn't and I just had
7      improper help, if you will.  Improper help.
8  Q   From whom did the improper help come from?
9  A   It came from the person I was working with, Donna
10     Bettis.
11 Q   And the lawyer you've been talking to now is someone
12     else?
13 A   Yes.
14 Q   Who is that?
15 A   It was on my phone.
16 Q   Actually, at one point you had talked about a lawyer
17     named Watts, right?
18 A   Yeah, who I met down -- I was in the law library,
19     trying to do some things and he approached me and said
20     that he would assist me and would help me.  And we
21     definitely exchanged -- I gave money and he was
22     supposed to show up and then come to find out I had
23     the wrong -- the phone number he used was wrong,
24     the -- I couldn't find the card.  I searched all over
25     to get that card, etc., had a difficult time so I

Q & A COURT REPORTING (248) 681-2499

1    realized I was scammed.  I found out that he was not

2    even licensed any longer and I can't find him and the

3    person whose phone number that he had given me said

4    that he just came in there and didn't know that he

5    used their number for me to call so --

6  Q   You called his office one day from court, right?

7  A   That's the number that I had.

8  Q   And when you called, they didn't say they didn't know

9    who that was, though, right?

10  A   Exactly.  That's what they said.  He was utilizing

11    their number and just came in and was looking for

12    space there.

13  Q   Did you walk into an office at one point to pay him?

14  A   No.  We were at the law library.

15  Q   You paid him at the library?

16  A   Not at that day, a second time.

17  Q   But at the library?

18  A   Yes.

19          MR. RANDEL:  Why don't we take a break.  I

20    want to see if you can find out who you're working

21    with now and that might help.

22          THE WITNESS:  Okay.  Great.

23          MR. RANDEL:  Can you go off the record for a

24    second?

25          (Whereupon a short recess was taken)

Q & A COURT REPORTING (248) 681-2499

51

1          (Deposition Exhibit No. 3 was marked for

2          identification)

Page 47

    3  Q    (By Mr. Randel):  All right.  You found out -- got the
    4       name of the attorney you've been talking to; is that
    5       right?
    6  A    Correct.
    7  Q    And his name is?
    8  A    It's Adel Fakhouri and the spelling is F-A-K-H-O-R-Y
    9       (sic).
   10  Q    And he's also working with Michael Jaafar; is that
   11       what you said?
   12  A    Correct.
   13  Q    But you haven't spoken with Mr. Michael Jaafar?
   14  A    I haven't, no.  I've actually spoken with Adel and his
   15       partner at his law firm on Wednesday.
   16  Q    Do you know Mr. Fakhouri's partner's name?
   17  A    Farris is the last name.
   18  Q    Farris?
   19  A    No.  Farris is the first name.  Haddad is the last
   20       name.
   21               Sounds familiar?
   22  Q    You're considering retaining them to help you in some
   23       of these cases?
   24  A    All of them.
   25  Q    You've told them if they're going to get involved in

                    Q & A COURT REPORTING (248) 681-2499

                                                            52


    1       this case, they have to do it right away, correct?
    2  A    Correct.
    3  Q    And you told them that I'm the lawyer for the U.S.
    4       Trustee on the case?
                         Page 48

 5  A    Correct.

 6  Q    All right.  You mentioned that -- previously mentioned

 7       that you provide some services -- you provided some

 8       services to Mr. Carpenter that you don't think were

 9       related to bankruptcy; is that right?

10  A    Correct.

11  Q    And you've previously refused to answer the questions

12       that I've asked about what that was, right?

13  A    Correct.

14  Q    And we've gone a little further down the road here.

15       You know what types of things I'm interested in,

16       right?  Is that right?

17  A    Yes.

18  Q    Are you now prepared to talk about the services you

19       provided to Mr. Carpenter?

20  A    No.

21  Q    And before you concede you don't have a legal basis to

22       refuse to answer, right?

23  A    Well, for the record -- for the record because I'm

24       seeking counsel and counsel and I have not been able

25       to sit down and discuss everything together I refuse

                                                        53

 1       to just speak on that right now until I get proper

 2       advice.

 3  Q    You realize the hearing on this case is a week from

 4       Monday, right?

 5  A    No.

 6  Q    When do you think the hearing on this is?

 7  A     What's Monday -- a week from Monday?  I thought it was
 8        the latter part -- I got too many cases confused.
 9  Q     Today is the day of your deposition, right?
10  A     Correct.
11  Q     You've known about the hearing since March when the
12        judge set the -- issued his order, right?
13             Here's my problem:  I need the information
14        before the hearing.
15  A     Okay.
16  Q     You're refusing to provide it and you don't have a
17        legal basis.  Your stated basis is you want to confer
18        with counsel?
19  A     Correct.
20  Q     You've had a substantial period of time to do that and
21        there's no more time for you to give me the
22        information so I don't have a choice but to ask the
23        Court for a remedy if you refuse to provide this
24        information that you are obligated to provide now.
25  A     What you'll do is possibly if you'll speak with my

                   Q & A COURT REPORTING (248) 681-2499

                                                              54


 1        attorney and we'll take it from there.  I cannot say
 2        much right now.
 3  Q     All right.  You mentioned that you got advice from
 4        friends and colleagues, correct?
 5  A     Correct.
 6  Q     And before you wouldn't reveal who they were.  Will
 7        you tell me who they are now?
 8  A     I gave you a few names.  That's all I'm going to say.

                              Page 50

9  Q    What names did you give?

10  A    I gave you Donna Bettis.

11  Q    Did you talk to anybody besides Donna Bettis?

12  A    Yeah; just some friends that it wouldn't even matter.

13        They don't know.  They only stated -- thought this was

14        a great idea, period.

15  Q    Were these people who had done this?

16  A    No.

17  Q    Did they tell you what their basis was for thinking

18        this was a great idea, other than you thought you

19        could make money doing it?

20  A    It wasn't even about money; it was about helping

21        people.

22  Q    Did any of these people have any -- did you have any

23        reason to think any of these people had any insight?

24        Are you refusing to answer that?

25  A    Yes.


                    Q & A COURT REPORTING (248) 681-2499


                                                            55


1  Q    Do you have a legal basis to refuse to answer that?

2  A    The legal basis is I am not going to divulge anything

3        until I speak with my attorney, which I wished I could

4        have before the deposition, but due to the fact that

5        we only met over the telephone on Wednesday prior to

6        this after I found out that I did not have Attorney

7        Bettis any longer and who was not answering any of my

8        calls so I am here without any type of help legally.

9  Q    Other than that, do you have any legal reason not to

10        answer my question -- any legal basis not to answer my

                           Page 51

11      question?

12  A   No.

13  Q   And you have documents about the other services you

14      provided to Mr. Carpenter that you didn't produce

15      today, right?

16  A   Correct, his personal documents.

17  Q   And other than saying they're his personal documents,

18      do you have any legal basis not to produce those?  You

19      have to answer out loud.  You have to answer out

20      loud.

21  A   No.  Privacy, private contract between myself and my

22      client.

23  Q   And you're refusing to provide me the documents about

24      the private contract between you and your client,

25      right?

                Q & A COURT REPORTING (248) 681-2499

                                                              56

 1  A   Correct.

 2  Q   Do you have a legal basis to refuse to produce that?

 3  A   Can't answer that without counsel.

 4  Q   You don't know if you have a legal basis?

 5  A   Right.  Don't know.

 6              MR. RANDEL:  All right.  I have no further

 7      questions.  If you had an attorney, it would be your

 8      attorney's opportunity to ask any questions so if you

 9      wanted to put anything on the record about the case,

10      this would be your opportunity.  You're under no

11      obligation to do so.

12              THE WITNESS:  Oh, okay.  No.  I need legal

                           Page 52

13    advice.

14              MR. RANDEL:  Okay.  Thank you.

15              That will conclude the deposition.

16              THE WITNESS:  You're welcome.  Thank you.

17              (Deposition concluded at 11:35 a.m.)

18                   --- --- ---

19

20

21

22

23

24

25


              Q & A COURT REPORTING (248) 681-2499


                                        57


1                    CERTIFICATION

2

3    STATE OF MICHIGAN)
                     )SS
4    COUNTY OF OAKLAND)

5

6

7    I, Hope M. Markowitz, Notary Public and Court Reporter

8    in and for the above county and state, do hereby

9    certify that the deposition of DOSHIA M. BANKS was

10   taken before me at the time and place hereinbefore set

11   forth; that the witness was by me first duly sworn to

12   testify to the truth, the whole truth and nothing but

13   the truth; that thereupon the foregoing questions were

14   asked and foregoing answers made by the witness, which

                    Page 53

15    were duly recorded by me stenographically, and by my

16    later reading from stenographic notes prepared the

17    foregoing deposition transcript in final form; and I

18    certify that this is a true and correct transcript of

19    my stenographic notes so taken.

20

21

22

23                    _____
                      HOPE M. MARKOWITZ, CSR-3900
                      Notary Public
24                    County of Oakland, State of Michigan
                      My Commission expires: 12-10-12
25


                Q & A COURT REPORTING (248) 681-2499